Case number 23-1174 et al. City of Port Isabel et al. Petitioners versus Federal Energy Regulatory Commission, and case number 23-1175 et al. City of Port Isabel and Sierra Club Petitioners versus Federal Energy Regulatory Commission. Mr. Matthews for the Petitioners, Mr. Kennedy for the Respondents, Ms. Chilakiamary for Intervenor Rio Grande LNG, Mr. Pincus for Intervenor Texas LNG Brownsville. Morning, Council. Mr. Matthews, please proceed when you're ready. Good morning, Your Honors, and may it please the Court. Nathan Matthews on behalf of Petitioners, Pacinos, City of Port Isabel, Sierra Club, and the Carrizo-Concludo Tribe of Texas. FERC failed to respond to either issue from this Court's 2021 remand. On greenhouse gases, this Court held that 40 CFR 1502.21 apparently required FERC to use the social cost of carbon as a method generally accepted in the scientific community, notwithstanding FERC's criticisms of the tool. But on remand, FERC ignored that notwithstanding and merely repeated concerns about the tool without addressing whether or not it was generally accepted in the scientific community. And on environmental justice, FERC has again provided an analysis of disproportionate and adverse impacts on environmental justice communities that is not connected to FERC's analysis of actual impacts. Beyond those issues, FERC's analysis of new information introduced new errors, and FERC violated NEPA by reauthorizing the projects on the basis of new analysis without providing any additional NEPA process. So there are a lot of issues in this case. I plan to begin by talking about four of them, but I'm happy to redirect on any issues that the Court wants to discuss. Just beginning with the environmental statement where you suggested there ought to be a supplement. Under a normal process, you could submit a draft out for comment, receive the comments back, and then go to a final environmental statement, right? That's correct, Your Honor. And so what is so different here in that even if there's new information that's received during that comment period, it doesn't mean that when you put your final statement out, you should just go ahead and explain it, but you didn't have to go and ask for further comment about the comments that came in. So I may have misunderstood the question, Your Honor. No, because what I'm just saying is you have a draft that goes out. It receives comments. Then FERC goes and addresses those comments before it puts out its final draft. During that comment period, it might receive new information, but that doesn't mean you then put out another comment period. You can just go and deal with the comments in the draft. There are circumstances where if things proceed as you described, the final environmental impact statement can change relative to the draft. The whole point is that it may change in response to comments without needing to do a new draft. The regulations do contemplate that at some point the changes are so much that you need to do a new draft. I guess that's what I'm trying to get at is it can be a very intractable process in the sense that as long as the comments are addressed within that final draft, you don't have to every time there's new information come out, then put it out for more comments. So I agree with you about how that can work when there is a draft environmental impact statement. The main distinguishing factor here is that there was no draft. FERC, after the remand in 2021, did not put out any draft of FERC's own analysis for comment. All that FERC put out was a solicitation for some comments on a subset of the applicant's submissions. That was not the equivalent of a draft supplemental environmental impact statement. Everybody got the opportunity to comment. Do you have any evidence about some wish to and they didn't feel like they had that due process ability? Yeah, we feel like we didn't have that adequate opportunity for a number of reasons. One is that FERC didn't ask for comments on everything that FERC actually relied on. So, for example, FERC's comment solicitation didn't identify the demographic information that FERC actually relied on in its environmental justice analysis. It's also, NEPA is very clear that the agency is supposed to provide its own analysis, that we're not supposed to comment on the applicant's submissions, but that FERC needs to, or any agency, needs to take a first pass at explaining whether it agrees with the applicant's submissions, pass its own judgment, and then we can comment on that. Again, there was material that just wasn't included in the comment solicitation. We only had 21 days to comment, whereas the NEPA regulations require a minimum of 45 days for comments on a supplemental environmental impact statement, and frankly, if we had twice as much time, we could have done much more with our in-house resources, and we frankly couldn't hire an expert with 21 days, but we could have hired an expert to help us digest this material if we had 45. Council, the threshold question for whether an SEIS is required is whether there's new information that paints a seriously different picture. As I understand it, what FERC is saying is, yes, we redid the EJ analysis with a 50-kilometer radius instead of a 2-mile radius, but at the end of the day, it was based on effectively the same or very similar emissions data that was already out there, and it's not a case where we've identified some new threat that's a significant threat to any of these communities, and so, you know, yes, it's different, but it's not a seriously different picture in the way our cases contemplate. So I have three responses to that argument, Your Honor. One is that on FERC's new analysis about environmental justice communities, FERC's prior analysis said that there was just nothing to worry about there. FERC had said that there would be no environmental justice community that would suffer disproportionate and adverse impacts, and on remand, FERC says that not only will there be disproportionate and adverse impacts, but that hundreds of census blocks will have environmental justice communities who suffer impacts that FERC says rise to the level of being disproportionate and adverse, and in Vicinos, this court, you know, upheld FERC's analysis of the actual air quality impacts, but said FERC's conclusion as to whether or not those impacts are disproportionate or adverse could change FERC's ultimate decision about whether or not the projects are consistent with public interest. So that identifies the conclusion of not just what the air pollution will be, but whether that air pollution is something you should take seriously and whether it constitutes a disproportionate and adverse impact is a seriously different picture, because the court has recognized it may lead to a different outcome. So you had two other points, and I don't want to hear what those points are, but is your view that FERC had to prepare a supplemental EIS, or is your view that the information was significant enough that FERC had to do more to explain why it wasn't going to prepare a supplemental EIS if it wasn't? So in this case, our view is that FERC was required to prepare a supplemental EIS. You're not making the other argument. You don't think there's an intermediate zone in which there's significant information such that there's some triggering condition for an explanation of whether— rises to that level. And I think that with the argument about the new finding of disproportionate and adverse impacts, that raises that question. Some of our other arguments as to why a supplemental environmental impact statement is required, I don't think, implicate that, which is why I think we could possibly skip past it here. Another one of our arguments is that insofar as FERC is relying on new analysis, independent of whether it reaches a different conclusion, that when FERC uses new analysis to cure the NEPA deficiency that was identified in 2021, that that new analysis needs to be presented to the public through the NEPA process. We don't think that the prior Bacino's decision held that a supplemental environmental impact statement was absolutely required. The court gave FERC a choice. The court said there seems to be a discongruity between the scope of your environmental justice analysis and the scope of your environmental effects. Either explain why that's not a problem or do a new analysis. And on remand, FERC chose the second option. If there had been something that FERC could have said as to why actually the two-column array ideas and the conclusion of no disproportionate and adverse impacts was defensible, then FERC wouldn't be providing any new conclusions and therefore may not have been required to provide a supplemental EIS. But when FERC effectively— That's the second of the three? That's the second of the three, yes. Okay, so what's the third? And so the second is curing a NEPA deficiency requires new NEPA process. The third is closely related, which is that when the agency is actually relying on new analysis, independent of whether there was a prior finding of a NEPA deficiency, that that new analysis has to be presented in an EIS. So this part has a series of cases that have said supplementation is required when there's a seriously different picture. In every one of those cases, the agency was actually still relying on the analysis in the EIS. The question was whether there was new information that the agency, you know, should have considered. But this part has never said that an agency can kind of gut the underpinnings of its analysis, put something new in its place, and as long as the end conclusion looks similar, you don't need to provide a public comment or a supplemental EIS. So here, we're not saying that—we haven't argued that FERC was required to solicit new air pollution emissions data and conduct an entirely new analysis of air pollution. But once FERC chose to do so and rested its decision to reauthorize this project, a completely new analysis that FERC was required to provide the public with an opportunity to weigh in. And not just—NEPA doesn't just say provide the public with an opportunity to comment. NEPA is a highly structured process of making sure that that comment opportunity is effective, and FERC had to use that structured NEPA process here. So if there are more questions about the NEPA supplementation and process claim, I'll just note that the failure to provide NEPA process mattered here. This can't be dismissed as a harmless error. It certainly mattered to the hundreds of environmental justice communities that didn't receive any notice that FERC thought that the impacts that they would suffer would rise to the level of being disproportionate and adverse until FERC issued the reauthorization orders, at which time it was too late for non-parties to submit comments or to intervene or anything. So FERC could put out information about what the, you know, in parts per million, what the air quality would be for these communities beforehand, but FERC didn't tell them they should care until it was too late for them to do anything about it. And for us, we weren't able to provide those effective comments as we would have if we'd had the 45 days, if we'd had something more robust to comment on. And if we provided those more effective comments, that likely would have influenced FERC's decision-making, or at least this court can't be certain that it wouldn't have influenced FERC's decision-making. And so the failure to provide adequate process likely influenced the actual outcomes here. Can I redirect you to the carbon capture and sequestration issue? So I understand the big-picture position that you're taking is essentially that once Rio Grande puts this alternative on the table, the process should have essentially halted, and that it needs to be considered as an alternative to the terminal as is. And I think what the – I'd like to hear your response to the first thing that FERC says, which is, well, you know, the scope of alternatives to consider was something that became final in 2019, and it was outside the scope of the remand, and this whole issue is just procedurally barred. Why isn't that correct? So one answer is that that doesn't address our argument that carbon capture and sequestration is a connective action, which is sort of a – let me address the alternatives part of that. Well, can I just ask you about that? Because it seems to me that it should rise and fall together, because if it's a connected action, but you only learn about the second connected action years after the first action was finally approved, it seems like an odd basis to reopen. I think the fact that Rio Grande positioned this alternative as something that it asked FERC to consider as part of its remand in reconsideration of the terminal itself – yes, they started first, but Rio Grande expected them to end at the same time and to be considered in parallel. So I think that that possibly answers that question. But I think that we also have an alternatives argument separate from the connected action argument. And what this court held in the 2021 decision was that FERC had failed to address whether the project's greenhouse gas emissions rendered it contrary to public interest for purposes of the Natural Gas Act. And the Natural Gas Act doesn't just require FERC to give up or down approval of the projects. FERC has an open-ended authority and an obligation to require modifications of projects when those projects are in the – would be appropriate. So that's 15 U.S.C. 717B sub E, somewhere under sub E. And so in this case, you know, FERC has never determined that it would be appropriate to approve this project despite its greenhouse gas emissions because it hasn't given those emissions a fair consideration. And as a part of that, FERC hasn't determined whether or not it would be appropriate to require any modifications to address those emissions. And so once this court remanded and then on that remand, Rio Grande said, hey, we could potentially solve a large part of this problem. FERC hasn't already said, we don't need that because we've already decided that the project is okay without it. This court held, no, FERC, you haven't supported that decision. So this isn't asking – maybe to sum that up. Our alternatives argument isn't asking FERC to revisit a decision that was already proper and final. There was no final decision here, and so FERC can't claim that they've kind of capped that off. Let me ask you on the carbon capture and sequestration. I know that you have made a point that it's not necessarily unidirectional, that actually there could be some adverse environmental consequences from that too. But just for assumption purposes, just put that to one side for a second. Let's suppose that it only points in one direction, that it can only be environmentally beneficial. If we are in that world, what happens to your argument? That strongly supports the alternatives argument and possibly undercuts the connected action argument a bit because the connected action argument is about before you set in motion a chain of events that may have adverse consequences, you need to know what those adverse consequences will be, which is, I think, why we're concerned about that here. But even if it's carbon capture, and I have to emphasize, especially certain petitioners strongly resist the premise that carbon capture… I get that. I want to get to that. I want to get to that. So if there's nothing bad that could possibly come from it, it is less important to make sure that it's considered now rather than later from a connected action perspective. But from an alternatives perspective, that doesn't really change. I don't see how that changes anything because the point is still, it changes the question before FERC, which is not, is this project going to provide benefits that are so great that we should accept 7.2 million tons per year of greenhouse gas emissions? Could we get those benefits? Would it better serve the public interest to get those benefits with an alternative that has drastically lower emissions? And it's an alternative that the applicant proposed. Our concern is just… They've withdrawn. They haven't officially withdrawn it. They have not provided timely responses. But if you go to their website or their investor communications and things, everything that I'm aware of, they continue to hold out that that is what they plan to do. And then can you just, on the premise, so give me a quick explanation of what the argument is that there's adverse environmental consequences that flow from… So there are some adverse consequences that are certain. And we know that once you capture the carbon, it's got to go somewhere and that that's going to need a pipeline. FERC has told, or the applicants have told us that that's going to be about a 10-mile pipeline. The project is in the middle of wetlands and a wildlife refuge. So there's nowhere to put, we don't know which direction the pipeline would go, but every available direction crosses habitat and wetlands and things that petitioners care about. There are also issues we don't know as well, like carbon capture would use an amine process. We aren't aware of evidence on, like, how much of those amines end up into the air and what would be the air pollution consequences of that. So I think that a hard look, like, this seems like a promising alternative. We're not sure its benefits are going to outweigh its costs, however. And so the whole point is to address that alternatives have pros and cons, and you've got to do a rigorous exploration to decide whether they're worthwhile. Can you just help me on alternatives? So is the way the landscape is set that as long as the agency takes into account reasonable range of alternatives, the requirement is satisfied, even if some alternatives could come up at some point later in the process. But at some point, there's just a number you have to take into account a reasonable range of alternatives, and then you've done that. But the fact that something happens to come up later on in the process doesn't necessarily mean just because it's a plausible alternative it has to be folded into the analysis, or is it that every time a plausible alternative comes up at some point before the decision is made final, that it has to be folded into the analysis? So I don't know that alternatives are any different than other new information in that regard, or the agency would need to address it. And they may be saying that, you know, this alternative isn't actually all that different from the other alternatives that we considered, so it's not worth – it doesn't need separate or additional discussion, or the agency might be able to quickly say, you know what, this alternative isn't feasible, so we're going to dismiss it anyway. There are a lot of potential factual scenarios that I think do not apply here where it's not our alternative. The developer explicitly in response to this court's decision said, you know, this is – we want to do this. It's technically feasible. It's economically feasible, but we're not going to commit to it. But for purposes of your alternatives argument as opposed to the connectedness one, I take it it doesn't matter where it comes from. I mean, the alternative could come up. It could just be posted on the web by an anonymous contributor, and still the question is whether the agency has to take it. I think that if it comes up by an anonymous contributor, the agency might be able to say, we don't have evidence that this is technically feasible or economically feasible, or there may be missing facts or facts that it's easier for the agency to say. This doesn't really change the picture. But because in this case we aren't concerned about technical or economic feasibility, because at least maybe not conclusively but facially, the fact that the applicant proposed it demonstrates that this is something that they think could work. You know, our claim here is really that then it shouldn't be left to – once the applicant has put that evidence into the record, it should be FERC rather than the applicant who decides whether the public interest is better served by this. And then I was just going to ask about the Brownsville monitor, the three years' worth of data. Yes. Yeah, so this is, I think, a little different than a lot of the other claims in this case, because it's not about the conclusions for Kamburu. It's about what the actual impacts will be, you know, how bad the air pollution really will be. We identified the Isla Blanca air monitor. No one in this case disputes that the Isla Blanca monitor had three years of valid data in January 2023 when the analysis that FERC actually relied on was performed, or that if that data was used, it would indicate an exceedance of the national ambient air quality standards. So FERC's argument for not using that monitor is to say that we needed at least 36 months of data. But at the time the analysis was performed, there were 39 months available, and FERC hasn't explained why the requirement for 36 months of data matters. You know, and FERC also has this argument that perhaps the Brownsville monitor is closer to larger environmental justice populations, and we're not, I mean, fine, go ahead and use the Brownsville monitor for assessing effects in Brownsville, but FERC can't use that to ignore evidence of a more severe impact on the city of Port Isabel and the environmental justice population there. Does that answer your question? Yes. My colleagues don't have additional questions for you at this time. We'll give some time for rebuttal. Kennedy? Good morning, Your Honors. Robert Kennedy on behalf of the Commission. I'm going to start where we just left off, Judge Childs, because we do dispute both issues with respect to the monitor. We do dispute that there were three years of valid data. As the Commission explained in its rehearing order, there's sort of two timing points. One, the background period that these analyses looked at for Rio was 2019 to 2021. This monitor didn't start until October 2019. I believe Texas was 2018 through 2020, so there's a mismatch there, but there's also a mismatch when the Commission looked at the developer submissions, conducted its analysis in early 2003 when it issued the remand order. By that point, if you look at the EPA spreadsheets that the Commission cites to in the remand orders, the data hadn't been validated and given a thumbs up by the EPA for use in analysis. So in choosing the Brownsville monitor and relying on that solely, the Commission was following the EPA's modeling guidance that you should use a monitor with three years of validated data. Where is that in the remand order, the explanation of why what seems to be more than three years actually shouldn't count as one? You'll see that in the remand rehearing order. You will see that in paragraph 27, which is JA 189, where it discusses the beginning of the start date in September. I'm sorry, in October 2019. And then the EPA spreadsheet I'm talking about is referenced in footnote 64 there. And in terms of the notion that no one disputes their portrayal of the data, the Commission hasn't looked at it. But I would urge you to take a look at that spreadsheet because it talks about what types of monitors these are. The Brownsville monitor is listed as one that you use for looking at impacts on population, while the one at East La Blanca says for traffic. Now, the Commission didn't speak about any of this because it didn't look at the data. But the Commission's other point was, and it cites to a mapping tool the EPA has, that, look, what we're interested in here is the impact of these emissions on populations. Brownsville is in sort of the heart of where most of the EJ communities are. East La Blanca is way out on the coast. So we think it's more appropriate to rely on the Brownsville monitor. And at the end of the day, our position is this is just one of the technical choices that is left up to the agency. The agency explained itself, and we think its position is reasonable. Just on the second reason, why couldn't FERC have used both monitors if there were available data? Well, if the Commission believed that it was appropriate to use it because there was three years' worth of validated data, then maybe it would have considered that. But it never sort of got to that point because there's a threshold. But then it's not independent. So, in other words, the second one then doesn't stand or fall alone. It's dependent on the ostensible absence of three years' data. I think they are independent. I mean, the Commission could have looked at it and said, we have no reason to include this monitor way out on the sea. We're concerned about what's going to happen in these populations. Even if it had three years of data? I think it's possible. I thought you were just saying, in response to Judge Garcia, that built into the second rationale is an assumption that there wasn't three years of data. Well, I guess the Commission's point with respect to the location of these, even if East Lavonka was sort of valid for use, there's still a choice that the Commission couldn't rationally make that say, no, we're going to focus on the data from Brownsville because that's where the population center is located. There's been no citation on the record that's sort of excluding that, even if it had valid data, which it didn't at the time, violate some sort of modeling concept. The first thing you said, just on the three-year period, was that FERC was insisting on a three-year period that was more dated than 2019 to 2023, and you gave a citation from the Texas JA. I'm sorry, but do you have a site in the Rio Grande JA for that? Oh, I'm sorry. Did I get that wrong? So it's the rehearing order in the – so I'll give you – for the Rio case, it is paragraph 27, which should be JA 190 from Rio, and then for Texas, there's a comparable citation. Yes, and it's a – maybe seems like a small bore point, but all that paragraph says is this LeBlanco only started in October 2019, and that's not three years of valid data, which on its face makes no sense because you asked for the data in 2023, 39 months later. It would be a very good explanation if there was a reason you needed data from before October 2019. I just don't see that in the orders. I have to give you a look at this paragraph – I'm sorry, that same paragraph in footnote. Excuse me, I'm going to say it again. It's 65 that's citing the spreadsheet. Is that where – footnote 65? So there's 63, which cites the EPA regulations regarding that that design value should be based on three years' worth of data. So that's sort of the standard that the commission's basing its modeling efforts on. And then footnote 64, that's the spreadsheet where at the time this was prepared, the East La Blanca monitor doesn't have a valid – there's a column for sort of what it's validated by, and it's blank because as the petitioner – excuse me, as Rio Grande interveners point out in their brief, that didn't happen until I think May, I think after the remand rehearing orders were issued. And they're only valid? So a lot of work is being done by the word valid, valid design values, and if you look at the spreadsheet, there's a way to discern that there was less than three years of valid. It will have a start date, and I can't remember the precise title, but it will have a start date. I assume it says essentially valid start date, and then it will have an end date. And the end date for Brownsville, it's validated by a specific date, but for East La Blanca, it's left blank. And then you go forward after these orders were issued. That's when the EPA finally validated the data from this monitor. I think the Rio Grande interveners cite to a later version of the spreadsheet after the commission orders where there now is an end date put in there. Now sort of going back to the – unless there's more monitor questions, turning back to the process point, our position is that 15029 governs when a supplemental EIS is required. This court spoke about the elements of that regulation in the unpublished decenios opinion, and it said that supplemental EIS is required only if new information will affect the quality of the human environment in a significant manner not already considered. So there's sort of three touchstones. New information not already considered has to be significant, and it has to relate to the human environment. With respect to the commission's error analysis, it looked on remand. The scope of the analysis on remand matched the scope of the analysis that was performed in EIS. Both of them looked out to see what the emissions impact would be on a – out to 50 kilometers. So there's no – excuse me – no new information in that regard. Is it significant? The remand analysis showed that there were no NAICS exceedances for any census block within that 50-kilometer radius. In fact, it showed that the emissions profile for the project actually improved. The first go-round, there was a nitrous oxide exceedance between the fence lines of the two facilities. That's gone away. Greenhouse gas emissions have got slashed by about a third. The ozone profile, the cumulative ozone impacts have decreased significantly. Pardon me. And, you know, in rejecting a call for a supplemental EIS in the unpublished senior's opinion, the court said one of the – upheld FERC's decision not to do so because the environmental picture got better. That's what the new information showed. Sort of the third component, what is really new here is the demographics of the population between the two-mile radius originally looked at and out to 31 miles. And, you know, the EPA – the CEQ regs define human environment as a natural or physical environment. The commission said that this sort of demographic data really – that's not what that's talking about. You know, there's – As the petitioners point out, the actual bottom line of the environmental justice analysis seems to have flipped. So it's a little unclear to what extent FERC means this, but certainly the bottom line conclusion before was there are no disproportionate adverse impacts to EJ communities, and now the conclusion is there are. And I think that's maybe their best argument for why this is, you know, a meaningfully different picture that those communities should have had a chance to comment on. I think if you take a step back and look at what the commission held in the authorization orders and looked at what it held here, there's not a substantive difference. And I think the best place to look at the commission's analysis, the first go-around is paragraph 69 of the Rio rehearing order. There's a similar paragraph in the Texas authorization rehearing order. And what the commission said there it looked at using its two moderators. It said, look, 24 of the 25 census blocks impacted by the Rio project are EJ communities. I think four out of five of the communities surrounding the Texas facility are EJ communities. So the commission said it's not useful to think about disproportionate impacts on a numerical basis like that because they're bearing all of the impacts. Let's go to the second step, which is permissible under the commission cited CEQ guidance in this regard. Let's go to the second step and see are there any unique factors in those communities that will amplify the impacts to a disproportionate manner as compared to the larger population. And looking at it there, it concluded that they wouldn't. That's when it looked through that all the emissions would be below the max level, that there was no, with respect to ozone at the time, they were projecting an exceedance. There was no unique demographic factors that would make those populations impacted to a greater degree than the larger population. So the commission recognized numerically these impacts are falling on EJ communities, but they're not expecting to be amplified in any manner, not accounted for. Here, the commission sort of, I mean, you get a sense of this in the orders, the commission noted it's sort of formalized its analysis a bit and has focused more on EJ issues through the years. So rather than, it made the same analysis, it looked at numerically the populations. And here within the 50 kilometer radius, it's about 97% are EJ communities. And rather than immediately going to the second, rather than saying, look, all this is hitting EJ communities and going to the second step, it made the conclusion at the top line, excuse me, saying there is a disproportionate impact on these communities because they are bearing all of it. And then it did the same analysis, went to the second step to see, let's see whether there's any underlying issues here that we're not aware of that would make them significant in a manner not already considered. And the only impact that's been brought up as possibly extending beyond the original two mile radius is air emissions. And it's the law of the case that the commission is reasonable in its reliance on the NAC standards to assess, even for sensitive populations, whether those impacts would be significant. So I agree there has been a little bit of change in language, but substantively, I don't believe there's been a change at all. There was, oh, carbon capture. Just to touch on that, as we explained in our brief, we don't think it is a connected action for the reasons identified, priming substantial independent. What's the current status of that in the commission's view? So I looked at the docket earlier this week and nothing of substance had been posted since we filed our brief. So I don't think the commission's made any statement that they view it as off the table or withdrawn. But there has not been any activity since since one of the briefs. So it's still active from the commission. It's still an open docket. Yes. The posture of that is that the project applicant could withdraw that at any time. Correct. Correct. With respect to sort of the alternative angle on this, we think it is barred by ratio of principles. They had an opportunity to raise a challenge and did raise challenges to the commission's alternatives analysis in the I.S. The court ruled upon them and our position on the fundamental requirements of rescue to cut is that the argument could have been raised before. And this was new information. Well, then I think I'm sorry. No, no, no. This specific proposal. I'll just put on the table what seems to be quite unique about this. It is a proposal by the applicant, not some random commenter on the Internet for the specific purpose. Of trying to increase its chance of being reapproved. And in that situation, it seems to obviously be. At least it's not part of a rescue to cut it. And it seems a difficult question. Whether the commission should have just deemed it time barred when it's the applicant itself introducing it into the process. Well, what the commission specifically said is the notion that this should be considered as an alternative is beyond the scope of the limited issues remanded to it. It said it's appropriate for a separate process. We will. There was a schedule until until things slowed down. So the commission's position is not that it will not look at it when it's ready to be looked at. The commission will analyze it and make a determination whether the benefits outweigh the costs. And it was odd to me that there was still an open proceeding. Right. I understand that there's an argument that it's outside the technical scope of the remand. But the commission has before a proceeding about whether to approve the terminal as is. And now there's a proposal on the table to have a terminal plus this system that seems to have a whole lot of environmental benefits. And, you know, the commission's job under NEPA and the Natural Gas Act is to assess the environmental impacts and make it considered judgment. It seems odd to me that it's the picture seems as though the commission was in more of a hurry to reapprove than the project. We're not resisting the idea of taking a hard look at this when it's ready to be looked at by any means. Our position is just limited as a legal matter. The court ruled on challenges to our alternatives analysis under NEPA and found that it was appropriate. And I understand that if I'm in the remand order, suppose that the court just said these are the issues that are going to be addressed on remand. Of course, to the extent new information comes to light in the scope of analysis on remand, that information presumably will be taken into account in the ordinary course as the agency typically would do. If there were that kind of allowance for taking into account new information, then would this proposal have been folded into the existing analysis as opposed to cordoned off as something that would be dealt with in a distinct way? In other words, is it only the scope of the remand, the perceived scope of the remand, that justifies the agency's not taking account of the carbon proposal as part of the existing procedure? No, it's the entire process. I mean, the commission reviewed these terminal – excuse me, specific to REIA, but reviewed this exhaustively for years, made a determination, finished its environmental analysis, made a public interest determination. The courts took on a challenge to it. The court found two flaws. The commission is addressing those, and it views that process but for the issues the court identified as done, and it will review this as a separate process. It wasn't for those reasons. It shouldn't be folded in. There was some reference to the greenhouse gas analysis. The remand there was just really an APA failure to confront an argument issue rather than determination that the analysis was faulty. For the carbon capture, I definitely understand the timing argument. I just want to understand whether – acknowledging this is very much a hypothetical, if this alternative was on the table during the initial round when you're looking at all the other alternatives, it's certainly something that NEPA would have strongly suggested the commission should take a hard look at as part of the same proceeding, right? You're not disputing that? No. Then it seems like everything turns on the scope of the remand. So it is the scope of the remand that's deciding whether – No. Again, I think there was the claim made in the original proceeding that the commission failed to fulfill its obligations under NEPA to review alternatives. There's no suggestion that this concept, carbon capture, couldn't have been raised and considered at that time. The court ruled no. The commission did what it was obligated to do – Oh, I'm sorry. By scope of remand, I'm including race judicata. Okay, okay. Sorry, sorry. I was not being clear. So it's the race judicata explanation, and the race judicata congeals at the time of the remand. So the explanation for why this wasn't taken into account as part of the existing proceeding is that the commission perceived the remand to have congealed this kind of challenge as race judicata at this point and can't be revisited as part of this proceeding, so it would have to be considered in a distinct proceeding. Well, also the commission thinks it's appropriate to consider it in a distinct proceeding because, you know, do you see the timing issue now that to put everything on hold will just delay a project that the commission is already determined to be in the public interest, even without this proposal? But if it had never gone up and never been remanded and this had come along at some point, you know, the evaluation could take some time, and then the intervener comes forward and says, oh, by the way, we have a new angle on this. We'd like to factor into the mix a carbon sequestration, then I think you would say that the commission then would have taken that into account as part of the existing proceeding. I'm sorry, Mr. McPherson, where is the existing? If before the commission had finished this environmental analysis and made a determination. Yes. But it has. There's been a challenge to whether it complied with its obligations under law. It was found that they did. And now the commission is exercising its judgment to treat this as a separate proposal, and we think under the CEQ regs that that's the appropriate way to address this. And so if there had been a vacate or a remand rather than just a remand, then definitely would have been taken into account as part of the proceeding. I guess it wouldn't even be a continuation of the same proceeding if there was a vacate. There would be a new proceeding, and it would have been folded into that. I mean, I'm thinking through here. I mean, there still would have been a ruling on whether an alternative, whether that would survive the vacater. I haven't thought that deeply about it. But fundamentally, that is our point. We fulfilled our obligation to consider alternatives. Nothing in the regs requires us to open this up and treat it as a connected action or anything like that. So we believe the commission reasonably found that when it's ready to move forward, it will be analyzed to the fullest extent. I just have one last question. So on the connected action point, is it your position that the scope of the remand issue, does that affect the connected action question? Or is that – I mean, I think that's sort of – we just do an up and down assessment of is this properly judged a connected action? I think it's the latter. I mean, I think what the commission explained here is connected action is something you look at in the scoping process. That took place in 2015, 2016, when we began the environmental analysis. And second, the other concern, the other part of it is substantial independent utility. The regs talk about interdependence, and here it's clear that the terminal can go forward without it. And then again, the policy concern underlying all this is looking at it separately going to mask some environmental impact that the commission didn't have when it made its initial decision. And I haven't heard any suggestion. I understand points about the impact that this will have on its own, but I don't have any – I haven't heard an argument that it somehow masks issues that the commission should have considered previously. Social cost of carbon. Okay. Just so that we can get to that particular topic. The remand asked you to address that specifically. Your response seems to be, we don't believe that it's scientifically valid, despite that there have been other communities, and what I mean by that, other agencies, land, environmental, et cetera, that do believe it's valid. So one of your responses would be, it's not scientifically valid, so you don't address it, or that issue, you're to address it. The other one seems to be, well, there's no standardized method in terms of a way to look at the data, in terms of how high emissions should be or what climate change, what's too much in that regard. But the EPA, at least recently, in its commenting period in 2022, suggests that you should look at this as scientifically valid, as opposed to just opposing it. So I'm just trying to get a sense of, you all don't put forward an expert that says it's not, but then the other side puts forward situations in which it has been used. So do you believe that you have responded to the remand appropriately in that regard? Yes. The commission identified three reasons why it didn't think it was scientifically accepted. I think it's important to go back to the beginning of the reg, it deals with missing information. So what is the information the commission needs here? It is the extent to which this particular project will contribute to global climate change, what those impacts will be. The commission noted first the, and I'll get to your points about the other agencies, but the commission noted first the dispute about the discount rate. This court noted in both earth reports and more recently, et cetera, for biological diversity, that that reflects a lack of scientific acceptance. And in terms of whether that's supported, I would point the court to, this is the Rio JA, I believe it's also in the Texas JA 243, which is the technical support doc for the tool. And it says the choice of discount rate raises highly contested and exceedingly difficult questions of science, economics, philosophy, and law. So I think on the first point, the record and the case law supports the commission's position that with respect to the discount rate, which is integral to the tool, that there's not a general consensus in the scientific community. The second point that the commission made, and this kind of gets into what the other agencies do, is that this tool was developed for rulemaking specifically. And there's no dispute about that. What we're talking about here is sort of off-label use in a way. And what the commission said in the Florida Southeast proceeding, which is a stable trail remand, is the reason it's not appropriate for specific projects is because it puts a big number on the table, but we don't have, which considers, you know, damage to agriculture in the future. The way the economy changes, political upheaval even, but there's nothing, we don't look at the benefits of the project in that same stark dollar cents average. There's qualitative considerations that the commission does to look at the, you know, you see some of the issues talked about in the original authorization order, how this affects international trade. Obviously, energy is key to foreign policy and the like. There's also economic benefits that aren't really tallied down to the dollar. So, it gives a distorted picture when you try and use it for this purpose, looking at one project. Now, if you cite to these other agencies, there's, I think it's footnote eight of Sierra Club's brief, at least in Rio. They cite the three, and two of those are three agencies that are using, two of them are programmatic EISs. And what that means is the agency's looking at four different possibilities for, I believe it's drilling or, anyway, four different proposals. And it's just, okay, let's put the cost of carbon on all those, and we're not, that way you can compare, that's sort of a fair comparison. The commission hasn't declared, hasn't, you know, hasn't taken the position that's not appropriate for rulemaking and things of that like, where you're just looking at the number and just on that basis alone kind of see whether, you know, out of these three, this one has the lowest dollar value. So, we're not disputing it could be appropriate in that circumstance. The other agencies, you know, they point to the fact that the commission cited in the Mountain Valley decision two other agencies who had used it. And, you know, one of them, the time has moved on, but the, one of them was a draft EIS from the Bureau of Ocean Energy Management. I think I could only find the final EIS now. And it has language just like the commission has here. It did put the number on the table, but it said it's not useful in the NEPA context, more appropriate in rulemaking. There's no sort of standard that the Bureau used in that case to make an up or down call as a significant. So, I think the fact that it is used in some context in, for other agencies, or maybe even used in sort of the same manner the commission did here, doesn't establish that it's scientifically accepted for this purpose. Please finish. Sorry, sorry. As to the EPA, I mean, the commission pointed out in the new guidance regarding, and this sort of goes to the third point about the lack of a significant threshold that the commission pointed out in the latest guidance, no one made the call as to, you know, what that should be. So, the commission found it's not appropriate for it just to sort of make up a number, particularly in a case, you know, that's on remand to address a regulation that talks about, you know, generally accepted scientific methodologies. And I think the court's other, you know, the line of cases that the court has issued with respect to social cost of carbon support the position, particularly Alabama. Once you get to that point, the commission acted reasonably in declining to use that to assess significance. Is it your understanding that no other agency has used social cost of carbon to make a NEPA significance determination? I have not seen it. Yes. That's my understanding. I'm surprised that I haven't taken a comprehensive view. No one has pointed one to your attention. Yes. Okay. I mean, the commission has made this again. This isn't, obviously, not the first time it's come up. And the commission again and again has said, you know, we're not aware of any study or threshold that's out there. And the court has repeatedly held in the absence of that, the commission is acting reasonably in doing what it does. Can you just say a little bit more about the distinction between project level and rulemaking? Because when you say, well, in a rulemaking, we can talk about the costs and then weigh them against the benefits of a project, I suppose, or of a rule. And my assumption seems to be you can't do the same thing for a project. And my question is simply, why not? Well, because you are – so with the rulemaking, you're looking at three, you know, courses of action, say. One of the things we want to look at is climate change impacts. And you can run the numbers for each one, and you just see, okay, which is the least. And if that's your primary consideration, you choose that. With a particular project, we're not choosing among – at this point now, we're not choosing among alternatives. We're looking at a proposal. And what the tool does is put a dollar value on every conceivable negative climate-related negative externality. And what the commission's point is that's not helpful because – that distorts the analysis because we're not doing the same thing for the benefits. We're not tying the benefits down to the dollar for these projects. There's an integrated assessment model for climate impacts. There's no integrated assessment model for the benefits of energy. So, it provides a distorted picture when you look at it that way. But is some of that a policy judgment? Well, I mean, is the commission's determination that it's – distorts its analysis? Yes. And when you look at the threshold issues, that some of that might be a policy judgment. The commission's explaining why using the off-brand use of social cost of carbon is not appropriate, why it distorts its analysis. Again, scientific – getting back to sort of generally accepted – could be for rulemaking. The commission, as the board noted in the first senior's opinion, the commission has chosen not to dispute that. We're certainly not. It's just this particular context – and again, I think that goes back to the purpose of this regulation, which is to supply missing information to answer the questions before the agency. And the question in a project-specific analysis is categorically different from a rulemaking. Do my colleagues have any additional questions? One other question. This is the issue about how the agency articulated the air pollution conclusions in the environmental justice analysis. The petitioners seize on some seemingly conflicting statements in your brief. I don't know if you know what argument I'm referring to. The fill argument? I think it's about just at a high level. In some places you say we're using the NAAQS or the fill to determine whether an effect is disproportionate and adverse. And we find there's no new NAAQS exceedances. But then in other places you seem to say there are disproportionate and adverse impacts, air pollution impacts. And we're left unclear to know just what you mean when you say there's disproportionate and adverse air pollution impacts. Sure. I think there's kind of two issues, and I'll get to them. One, again, as to disproportionate impacts, the commission's conclusion is that the project impacts, the whole suite of them, will fall on environmental justice communities disproportionately. They make up 97% of the affected area. They will bear the brunt of these. But they will not be, with respect to the particular environmental resources that matter, that are relevant, they will not be material apart from cumulative visual impacts. That's because for each census block within that 50-kilometer region, we've modeled it, and it's shown that there will not be NAAQS exceedance, and the NAAQS is designed to protect even sensitive populations. As to the sort of purported confusion about the sill issue, so what the commission said there, it referenced that to say, to sort of give assurance that the 50-kilometer radius is sufficient. It's saying, I don't want to get too deep into sill because I'll get over my skis, but it's saying it's a tool the EPA uses for modeling. And it says, if there is an exceedance of the sill, then you have to do some, if you're below it, you can presume not to have a, you can sort of stop your analysis. But if you're above it, then you have to do a cumulative impact analysis for that particular criteria. Make the point that the commission required the developers in both projects to do a cumulative impact air analysis for all criteria pollutants, regardless of any sill issue. So we were over-inclusive. When the commission referenced that everything dropped below the significant impact level at 12 kilometers, it was just to give assurance that we're not missing anything, that the 50 kilometers is sufficient to make sure we capture all the impacts that could fall on these communities. Well, just to piggyback on that then, what would be your response about was there a fair opportunity for comment, knowing that that was your analysis about the substantial impact? Yes. I mean, I think it's important to go back to the beginning, and you see the commission points this out in the early parts of its remand orders when it talks about environmental justice. There's sort of two notice points. You want people who are going to be affected. A, you want to notify people that this project is coming, they could be affected. B, you want to hear from them and give them the opportunity to raise any issues that they think is pertinent. When this began, the developers on their own and the commission as well did extensive outreach in the community, well beyond the two-mile radius that the commission ultimately looked at in the EIS, and gave people that had Spanish speakers there, gave people notice that the project was coming, an opportunity to provide comments. The EIS sort of lists how many comments they got. So there was certainly an opportunity for people to bring issues to bear. And then in sort of notice, the draft EIS, the final EIS, noted that there could be air impacts out to 50 kilometers, and that document was widely distributed. The appendices, the mailing list for these is in the JAs, and there are federal, state, local, city officials who were put on notice about that there's potential for impacts there from the very start. We also think our analytical position is if it's not required by 1502.9, then this is beside the point as a legal matter because there's no claim that this didn't satisfy due process or anything like that. But sort of the goal of this is to make sure everyone knows this is coming and they have an opportunity to raise issues. And that was satisfied at the front. And then there was extensive comment opportunities. And it did its job. The models were revised in response to Sierra Club's comments. Sierra Club's comments, they came in after the 21-day period. So the complaints, I think, about timing sort of fall flat. There was no comment that was rejected because it was out of time or anything like that. Certainly there were some the commission chose not to address because they didn't go to the issues on remand, but I think there was a fulsome process here and it satisfied to get notice and an opportunity for comment to all these communities. I just want to make sure I understand the position on the need for the SEIS and what changed from the prior analysis to the new one. And I understand you to basically be saying, yes, it looks like our bottom line conclusion changed because before we said no disproportionate impacts. And now we say, yes, there are disproportionate impacts. But that's not because the admission analysis changed in a material way. It's just because we decided the second time around to call it disproportionate if it's falling almost exclusively on minority communities. Correct. The admission profile only got better on remand. In both the authorization orders and remand, the commission did a two-step analysis. It's numerical. Let's look at how far these project impacts. Let's look at sort of the percentages of the community, EJ communities, upon whom these impacts fall. The commission said it's 100%, essentially, the first go around. So why are we even talking about that? We're going to base our disproportionate impact analysis on the qualitative assessment of how those resources will interact with these communities. It did that same step here, but it just made the same analysis here. It made the numerical call top. That's the disproportionate impact. And then it looked at the qualitatively and assessing whether they would be significant. Okay. Thank you. Thank you, counsel. Thank you, your honors. We'll hear from first intervenors, counsel, now. Ms. Shalakumari. Good morning. May it please the court. Varu Shalakumari for the Industry Intervenors for Rio Grande Project. I'd like to touch on the Isla Blanca Monitor first, if I can, and then turn to CURP and CAPTURE. On the Isla Blanca Monitor, this is within the core discretion of FERC in terms of the technical issue of picking a monitor. In FERC's brief, in FERC's rehearing order, specifically the footnote that Mr. Kennedy pointed to, it does cite to the Isla Blanca, the Design Value Data Spreadsheet, EPA's website. If you go to that website, it tells you that the AQF data retrieval date was May 22nd, 2023. So that was the time when EPA validated and published the data. Now, I know in reply, the petitioners argue that while the data was out there and FERC could have done the job of averaging out the data to get this three-year value that they could have used, but it's actually not simply a road calculation of data. The FERC's rehearing order cites to the EPA regulation. This is at JA 189, Note 63. And this is the EPA regulation that talks about how they do design value monitoring data to figure out what the background value should be. That's 40 CFR Part 50, Appendix N 4.1. And if you look at that regulation, subsection C and D, that tells you that when the EPA takes this data, when they take the three years to figure out what the established background rates should be, they actually exercise judgment. They don't just average out three years, but they take into account exceptional weather events. They take into account whether there was faulty data. So EPA, it's important that EPA validates that data, and it's completely reasonable for FERC to wait until you have three years' worth of data that is published and validated by EPA. So when the petitioners say FERC asked for this data on January 6, 2023, and that's 39 months after Isla Blanca was online, the point is that the only existing validated data, according to this footnote, was up to what date? The validated data was from, I don't know the date that it was existing, but the 2019 to 2023 data didn't come online until May of 2023, I'm sorry, the October. So the data that Isla Blanca, the three years that they're looking at is October 2019 to October 2022. That data wasn't published by EPA until May of 2023. And the rehearing and remand order, and even if the rehearing order came afterwards, but as we say in our brief, there is a valid reason to have a cutoff date. When an agency is looking at data, it is entirely reasonable for FERC to use that. And I don't think it is disputed, petitioners have not disputed that the data was not validated and published by EPA until, in our footnote, as we explain in our brief, May of 2023. Is it only validated when it's published? Once it's published by EPA on the website, it's in FERC's footnote. They're on footnote 65 of JA190. So publication, the way you're understanding it, is the key date? Yes. And that's because EPA, again, doesn't just do a road calculation. It exercises judgment when it's concluding on what data points it should use. This isn't necessarily a question for you, but do you understand the frustration that none of this is explained in the order itself? We're talking about, it seems like, secret knowledge that you have about what these links say. I appreciate that, Your Honor. I think that the footnote, if you look at the EPA website, the FERC sites too, it does have a spreadsheet where it has data retrieval dates. And you can see that it's May of 2023. But FERC also provided the additional reason that the monitor in Brownsville was closer to EJ communities and that the Isla Blanca monitor is in a non-EJ area on an island. So we think that's within the core discretion of FERC to choose which monitor it's going to use. If there's no other questions on the monitor, I'm happy to turn to the carbon capture issue. So I think it's important to note that the project has been authorized for over four years. In terms of the construction, construction has been going on for six months. There's a final investment decision here of $18 billion. You have 750 workers, mostly locally hired on site. So the terminal project is well underway. The carbon capture application was a voluntary application that was put forth by the developers. The developers very much want to go forward with that. That's a live application, but it is in no way connected. And the terminal project is not contingent on that CCS application. The terminal project will go forward with or without that project. But the carbon capture project has no function alone, right? The carbon capture project, and we don't dispute that the carbon capture project is dependent. But what we are arguing is that the terminal project, which is now temporally and functionally independent, is well on its way. And it is going to go forward with or without carbon capture, with or without, depending on how FERC handles the application. That's a legal standard, bilateral dependence or unilateral independence? Yes, our view is that bilateral independence is not required. And I think there's been no rule that bilateral independence is required in the D.C. Circuit. The Second Circuit has a very clear case on this, the Hudson River Sloop case. That's 836 F. 2nd, 760 Second Circuit. It was cited in FERC's brief. That very clearly has a situation where you had a port for a battleship was being built, and then you had a project for housing for families who would go to the port. The project for housing was very clearly dependent on the port, and the court said, we're just going to look at the port. It is itself independent. Just like here, the terminal project is independent, and the fact that you might have a subproject there that's dependent doesn't hold up the first project. I did want to get to, Judge Snow, your question about the timing of the earlier, the remand, and whether or not that means it reopens the entire scope. I think petitioners are arguing a couple of different reasons why the carbon capture project should somehow incinerate the larger project. First, they argue that it's a new alternative. That, we think, was clearly barred by the first Bacinos judgment. In addition, when you look at the rules for supplementation, 40 CFR 1502.9 D3, those are the rules that tell you when you have to supplement the EIS. That actually says exclusive of scoping. So we think that the initial decision of when you're doing the EIS, you're figuring out your alternatives, that ship has failed. Petitioners made several challenges to that in the original Bacinos judgment, and so in terms of scoping, in terms of whether there should be a new alternative, we think that is barred. Petitioners also make the argument that you should consider this as a new mitigation measure. That was also discussed by FERC in the earlier decision. FERC concluded that it was not going to consider new mitigation for greenhouse gases, and that was in the initial 2020 reauthorization order. And so both of these issues were previously considered, and we think are barred. So at least some of that sounds like it's independent of the fact that it came up as a remand. Because if it's based on scope, then even if you're still in the midst of the initial proceeding before it ever came up here, as I understand it, you're saying there's a scope phase that imposes a calendar line. And at the end of the scope phase, then you don't have to take into account the stuff that comes up afterwards, regardless of the fact that it came up and was a remand. I think that's right, Your Honor, in terms of alternatives. Now, obviously, it gives way to supplementation. If there's serious new impacts, but that's not what we think is happening here in terms of connected action and scoping. I think that's all off the table. That's been decided before. In terms of a supplemental new environmental harm or impact, we don't see that here either. And I think it would be quite an extraordinary proposition to say that you could have an authorized project, it's under construction, the environmental impact statement hasn't been vacated, and you have years later new technology. The developers here actually obtained patents for proprietary aspects of the urban capture project. You can have new changes in technology, and that can somehow make you reopen the earlier project. I mean, that would, I think, completely run afoul of what the supplemental environmental impact statement test is for. I think it is primarily a backwards-looking inquiry. When the original decision-makers were looking at the alternatives, did they say that, or were they harboring under some kind of misunderstanding about what the impacts would be on those existing alternatives? Not whether or not some new technology would come down years later that would change the alternatives. Otherwise, there'd be no finality. Just one factor that that telling might overlook is that the context here was there was a remand, and as I understand it, this proposal was explicitly advanced as a reason to secure speedy authorization of the project. In other words, it really seems like it was the client itself introducing this issue as part of a live, ongoing process. And now it feels like a bit of an about-face to say, well, actually, we got it approved without this expensive addition on top, and now we're going to take the position that it's time-barred. Can you just help walk me through why that's not a reasonable view? Certainly. And we're not saying it's time-barred that the CCS application will ever get considered. It is a live application with a FERC docket. Petitioners will be able to participate in that docket, and if they have concerns with the application or they want to argue about wetlands impacts, all those other things will occur. We are not saying that they shouldn't happen. Our position is that we introduced the application because that was the best business decision for the company. It very much wants to be a leader in Green LNG. It is not simply to curtail the remand order. Otherwise, the project applicants could have pulled out the CCS application after they got a successful rehearing order from FERC. That's not the intention, and the developers very much want to go forward. The petitioners point in their brief, they argue that we said in our application, well, this will minimize the impacts. That's true, but we didn't say you have to consider it. It's within FERC's discretion whether they want to consider it together or not. And FERC made the reasonable judgment not to consider them together because of the timing issues that you noted, Judge Garcia. You have the original decision that came down on remand, but it wasn't the entire environmental impact statement. It wasn't the reopening of the entire case. You have an ongoing project, and two narrow issues are on remand. So, I think from a temporal standpoint and in terms of a functional independence standpoint, they still remain very different. From your client's perspective, the application is still on the table, and it's something that is fully intended to be pursued. It's not being withdrawn. That's right, but we believe it's a voluntary application, and it could be withdrawn, but we intend to pursue it. As a practical matter, do you know the answer to whether, if the CCS add-on is approved, does that require some change to the ongoing, the approved project as it stands, or will it just be a… We explain this in the application itself, JA 714 and 716, that it's functionally independent. The CCS carbon capture could be turned off while the LNG terminal continues to function and so forth. So, it is simply a tie-on, and that's the reason why there's a FERC application. The rest of the carbon capture system would not be a FERC jurisdiction. It would be a carbon dioxide pipeline off-site to an underground injection well. Okay, make sure my colleagues don't have additional questions. Thank you. Thank you. Mr. Pincus? Good morning. May it please the Court, Michael Pincus for Respondent Intervenor, Texas LNG Brownsville. Because there's a lot of discussion about the Rio Grande project and the CCS amendment, I just want to point out that the Texas LNG project has not changed. The project and its impacts are no different than they were nearly nine years ago, over nine years ago, when the Commission started its review of the project. So, the only difference in the Commission's analysis that occurred on remand is that the Commission that overlaid the project impacts on additional demographic data to better understand and explain the impacts of the project on environmental justice communities at the direction of this Court. As I understand Petitioner's argument, although I did not hear it from them this morning, is that the remand order itself would require a supplemental EIS. But that is not true. The Petitioner's point to no requirement or instruction from the Court that required a supplemental EIS in the remand order. And, in fact, the Court had said it was reasonably likely that FERC could redress the two discrete issues while reaching the same result on remand. Let me just ask. So, I understand the underlying NAAQS determinations didn't change, but just in terms of how different this environmental justice analysis is, it seems like a fairly extreme case if you just look at how different the environmental justice analysis is. We went from sort of, I think, four or five blocks to hundreds. It's two miles to 50 kilometers. And when the whole point is to inform these communities of the impacts a project is going to have on them and thereby invite them to give public comment, it seems like the position you're all advancing would mean that a new EJ analysis is just never going to require a new EIS unless there's, you know, new admissions data that would independently require a, I realize this is a long question, but I just, isn't there a information, the whole purpose of the EJ analysis is to invite comment from those communities and there's significant new communities being described here? And I think the FERC solicitor pointed out too, the commission's process from the very beginning was a robust process that included involvement from the community. The very first scoping meetings were held back in 2015, and those were widely publicized. And at that point, I think the impacts of the project were first scoped and were made known to the affected communities. And then even during the commission's process on remand, having conducted a series of in-depth data requests and asking for a lot of information on the impacts of the project on these communities to the applicants, to the project proponents, and then having issued the notice and being able to take comment and then digesting those comments and having additional data requests that also included incorporation of those comments from the public, from the petitioners. That was a robust process that included these communities and the interests of people within these communities. Thank you. I'll make sure my colleagues don't have additional questions for you. That just concludes the Texas LNG project has substantial commercial agreements, and we believe that the project will be fully contracted in a matter of weeks, and that we have all the permits necessary to start construction, and we intend to by the end of the year. Thank you. Thank you, Council. Mr. Matthews, you have three minutes for a rebuttal. Thank you, Your Honor. It's a lot to respond to. On this particular matter, the LeBlanca Monitor issue, so much of the discussion about whether the data was valid is post hoc. It's simply not in the record. FERC never said we need EPA to validate this data in the record. It is true that validating it is not just a straight add up all the numbers and take a simple average. FERC links to the instructions on how to do it, and FERC never said we can't do it ourselves, we need EPA to do it. There are times where maybe you do need EPA to do some expert judgment about severe weather events, but there's no indication that that was actually a factor here. On the choosing Brownsville instead of Isla Blanca, I think FERC is arguing that they're telling the citizens of the city of Port Isabel, it doesn't matter whether you're going to breathe unhealthy air because these other people over here are going to breathe healthy air. But it's just not the way NEPA or recent decision making works. FERC needed to take a hard look at the impacts on the city of Port Isabel, even if FERC concluded that there was not a problem anywhere else. The timing of it, this court has held in County of Butte versus Hagen, that if new information comes in, even after an agency has already started its environmental analysis, the agency needs to address that information. And it may mean just explaining why it doesn't change anything or something, but the agency does need to address it, and FERC didn't address the Isla Blanca data that was available here. On supplementation, this court has repeatedly affirmed, including in disabled trails, that agency action violates NEPA if the EIS that undergirds it is insufficient. So one way that an EIS can be insufficient is that even if the EIS was valid when issued, new information comes out and calls that into question. And that's the situation 1502.9 addresses. But that's not the only time in which supplementation can be required. Here, FERC isn't relying on the old EIS. FERC felt that it had to collect new data, did a whole bunch of new analysis. FERC isn't saying we could have re-approved the project on the basis of the 2019 EIS. FERC has said, you know, we didn't need new information at FERC. It's fixing the problems with the information that was available the time before. And so we do have a 1502.9 argument about new information, including the new environmental justice conclusion. But the fact that FERC redid its entire analysis is a reason that a supplementation was required that doesn't squarely fit within the contours of 1502.9. On social cost of carbon, nowhere in the record, FERC argued that the agencies that have used social cost of carbon for project level review, that those projects were somehow different than the projects issued here. And some of the evidence that FERC cites about dental concern about the tool is frankly dated. You know, we included in the record the 2010, the very first announcement of the social cost of carbon protocols. At that time, the interagency working group on it said that the question of discount rates is contentious. 24 years later, there's a consensus among federal agencies that the way you resolve that is by presenting the range of interest rates. And we have CEQ, we have other agencies saying, go ahead and use social cost of carbon, even in project level review, even if you aren't monetizing other impacts. I think part of their response, though, is that what's not generally accepted is using this to determine significance in a NEPA sense. Even if it's a generally accepted tool, maybe that means they were required to use it and disclose it to put the project in context, which is exactly what they did. It's not quite what they did because they disclosed it, but they didn't incorporate it into their own analysis. I want to emphasize that FERC is a little different than other agencies here. The CEQ regulation at 1502.16 says that even after you've decided to do an EIS, in that EIS you have to discuss the significance, like it's a scale of impact. FERC says it couldn't do that here. But FERC, in its regulations and practice, has this extra requirement where it has to do an up-down, is an impact significant, like a binary question. That's in 18 CFR 380.7, but it's also just in FERC's practice. We're in a FERC EIS for every impact other than climate change. FERC says this impact is significant or it's insignificant, and then that carries over to FERC's Natural Gas Act analysis, where FERC will say all the significant impacts are something we don't need to worry about in deciding whether the project is in the public interest or not, and only the ones that are significant weigh in that analysis. And so it's true that there aren't other agencies that have achieved a consensus on where the line between significant and insignificant is, but that's partially because that's not a line other agencies draw. And it's true that our argument about drawing the line is not a 1502.21 argument. That's an argument about FERC has to consider social cost of carbon. FERC can't claim that it's not a reasonable reflection of what the costs will be. But once FERC is considering it, then it's just a straight APA claim about FERC has the tools to decide whether something is significant or not, and FERC hasn't provided any explanations to why monetized climate change effects are any different than visual impacts. I see that I'm out of time. At least one quick note to how narrow the CCS claim is here. We aren't arguing that if there was a valid authorization for the project that FERC was no longer considering because it was already out the door, and then new information about CCS came out, that FERC would have had to reopen the authorization to consider CCS. The issue here is that while FERC still had the terminal authorization pending before it, non-final, and then this alternative came forward, explicitly proposed as something FERC would consider in reconsidering the terminal, that's why there was an alternative argument here. But I just want to make it clear that we're not saying if there was a final authorization, they would have needed to reopen it. If there are no further questions? Thank you, counsel. Thank you to all counsel. We'll take this case under submission.
judges: Srinivasan, Childs, Garcia